# UNITED STATES  DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **MARION TAYLOR** | **CIVIL ACTION** |
| **versus** | **NO. 13-462** |
| **N. BURL CAIN, WARDEN** | **SECTION: "F" (3)** |

## REPORT AND RECOMMENDATION

This matter was referred to this United States Magistrate Judge for the purpose of conducting a hearing, including an evidentiary hearing, if necessary, and submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and (C) and, as applicable, Rule 8(b) of the Rules Governing Section 2254 Cases in the United States District Courts.  Upon review of the record, the Court has determined that this matter can be disposed of without an evidentiary hearing.  See 28 U.S.C. § 2254(e)(2).  Therefore, for all of the following reasons, **IT IS RECOMMENDED** that the petition be **DISMISSED WITH PREJUDICE**.

Petitioner, Marion Taylor, is a state prisoner incarcerated at the Louisiana State Penitentiary, Angola, Louisiana.  On August 28, 2009, he was convicted of second-degree murder under Louisiana law.[1]  On September 18, 2009, he was sentenced to a term of life imprisonment

---

[1] State Rec., Vol. VII of X, trial transcript, p. 394; State Rec., Vol. I of X, minute entry dated August 28, 2009; State Rec., Vol. I of X, jury verdict form.

without benefit of probation, parole, or suspension of sentence.[2]  On May 11, 2011, the Louisiana Fourth Circuit Court of Appeal affirmed his conviction and sentence.[3]  The Louisiana Supreme Court then denied his related writ application on January 20, 2012.[4]

On or about March 12, 2013, petitioner filed the instant federal application for *habeas corpus* relief.[5]  The state concedes that the application is timely.[6]

## I.  Standards of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") comprehensively overhauled federal *habeas corpus* legislation, including 28 U.S.C. § 2254. Amended subsections 2254(d)(1) and (2) contain revised standards of review for pure questions of fact, pure questions of law, and mixed questions of both.  The amendments "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law."  Bell v. Cone, 535 U.S. 685, 693 (2002).

As to pure questions of fact, factual findings are presumed to be correct and a federal court will give deference to the state court's decision unless it "was based on an unreasonable

---

[2]  State Rec., Vol. VII of X, transcript of September 18, 2009, p. 9; State Rec., Vol. I of X, minute entry dated September 18, 2009.

[3]  State v. Collins, 65 So.3d 271 (La. App. 4th Cir. 2011); State Rec., Vol. III of X.

[4]  State v. Collins, 78 So.3d 140 (La. 2012); State Rec., Vol. II of X.

[5]  Rec. Doc. 3.

[6]  Rec. Doc. 11, p. 11.

determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2); see also 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

As to pure questions of law and mixed questions of law and fact, a federal court must defer to the state court's decision on the merits of such a claim unless that decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1).  Courts have held that the "'contrary to' and 'unreasonable application' clauses [of § 2254(d)(1)] have independent meaning."  Bell, 535 U.S. at 694.

Regarding the "contrary to" clause, the United States Fifth Circuit Court of Appeals has explained:

> A state court decision is contrary to clearly established precedent if the state court applies a rule that contradicts the governing law set forth in the [United States] Supreme Court's cases.  A state-court decision will also be contrary to clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of the [United States] Supreme Court and nevertheless arrives at a result different from [United States] Supreme Court precedent.

Wooten v. Thaler, 598 F.3d 215, 218 (5th Cir. 2010) (internal quotation marks, ellipses, brackets, and footnotes omitted).

Regarding the "unreasonable application" clause, the United States Supreme Court has held:  "[A] state-court decision is an unreasonable application of our clearly established precedent if it correctly identifies the governing legal rule but applies that rule unreasonably to the facts of a particular prisoner's case."  White v. Woodall, 134 S. Ct. 1697, 1706 (2014).  However, the Supreme Court cautioned:

> Section 2254(d)(1) provides a remedy for instances in which a state court unreasonably applies this Court's precedent; it does not require state courts to extend that precedent or license federal courts to treat the failure to do so as error.  Thus, if a habeas court must extend a rationale before it can apply to the facts at hand, then by definition the rationale was not clearly established at the time of the state-court decision.  AEDPA's carefully constructed framework would be undermined if habeas courts introduced rules not clearly established under the guise of extensions to existing law.

Id. (citations and quotation marks omitted).  Therefore, when the Supreme Court's "cases give no clear answer to the question presented, let alone one in [the petitioner's] favor, it cannot be said that the state court unreasonably applied clearly established Federal law." Wright v. Van Patten, 552 U.S. 120, 126 (2008) (quotation marks and brackets omitted).  The Supreme Court has also expressly cautioned that "an unreasonable application is different from an incorrect one." Bell, 535 U.S. at 694.  Accordingly, a state court's merely incorrect application of Supreme Court precedent simply does not warrant habeas relief.  Puckett v. Epps, 641 F.3d 657, 663 (5th Cir. 2011) ("Importantly, 'unreasonable' is not the same as 'erroneous' or 'incorrect'; an incorrect application of the law by a state court will nonetheless be affirmed if it is not simultaneously unreasonable.").

While the AEDPA standards of review are strict and narrow, they are purposely so. As the United States Supreme Court has held:

- 4 -

> [E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable.
>
> If this standard is difficult to meet, that is because it was meant to be.  As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings.  It preserves authority to issue the writ in cases where there is *no possibility* fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents.  It goes no farther.  Section 2254(d) reflects the view that habeas corpus is a guard against *extreme malfunctions* in the state criminal justice systems, *not a substitute for ordinary error correction through appeal.  As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.*

Harrington v. Richter, 562 U.S. 86, 102-03 (2011) (citations omitted; emphasis added); see also

Renico v. Lett, 559 U.S. 766, 779 (2010) ("AEDPA prevents defendants – and federal courts – from

using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state

courts.").

The Supreme Court has expressly warned that although "some federal judges find [28

U.S.C. § 2254(d)] too confining," it is nevertheless clear that "all federal judges must obey" the law

and apply the strictly deferential standards of review mandated therein.  White v. Woodall, 134 S.

Ct. 1697, 1701 (2014).

## II.  Facts

Petitioner and co-defendant Justin Collins were tried jointly for the killing of Jerome

Sparkman, and both defendants were convicted of second-degree murder.  On direct appeal, the

Louisiana Fourth Circuit Court of Appeal summarized the facts of the case as follows:

- 5 -

In 2008, Dionne Sparkman ("Ms. Sparkman") accompanied the victim (her brother, Jerome Sparkman) to a car wash. At approximately 12:15 p.m., the two left the car wash en route to the victim's home, but the victim received a phone call that caused him to instruct Ms. Sparkman to drive to Juanita ("Peewee") Davis' house. Justin Collins ("Defendant Collins") was seated on Peewee's porch, and the victim exited the vehicle to speak to Defendant Collins. Ms. Sparkman could not hear the conversation between the victim and Defendant Collins, but stated that they spoke only briefly before she and the victim entered the house. Shortly thereafter, the victim went back onto the porch.

Ms. Sparkman went onto the porch to call Peewee's daughter to come inside. While on the porch, Ms. Sparkman noticed the victim talking to Defendant Taylor, Defendant Collins, and other friends that she did not recognize. While Ms. Sparkman recognized Defendant Taylor as one of the victim's friends, she had only seen Defendant Collins for the first time on that day. After Peewee's daughter entered the house, Ms. Sparkman went back into the house.

Ms. Sparkman and the victim remained at Peewee's house for approximately two hours. Approximately ten minutes before he was murdered, the victim entered the house to tell Peewee that someone at the front door wanted to speak to her. Ms. Sparkman observed that the victim was angry because he loaned Defendant Collins his vehicle (a white Impala) to drive to the store, and Defendant Collins had not yet returned with the vehicle. The victim spoke to Peewee again briefly and then left the house.

Not long thereafter, someone from the neighborhood came to Peewee's house and stated that the victim had been shot. Ms. Sparkman panicked when she heard the news and stayed in the house, worrying about how to tell their mother that the victim was dead. A few minutes thereafter, Ms. Sparkman ran from Peewee's house to the intersection of Annunciation and Laurel Streets, where she found the victim dead in the driver's seat of his white Impala.

Ms. Sparkman later spoke to investigating detectives and identified photographs of Defendants Taylor and Collins as the men she last saw with the victim; she also made an in-court identification.

Tawanka Sparkman ("Tawanka") and the victim were married and had four children at the time of the victim's death. The victim owned a carwash, and on the day of the murder, the victim left their home with his sister, Ms. Sparkman, and drove to his business in Algiers, Louisiana. On the day of his death, the victim was driving a white Impala. When the victim left Algiers, he telephoned

Tawanka and stated that he and Ms. Sparkman were going to the Tchoupitoulas Street area to see his friend Marion "Little Daddy" Taylor.  Tawanka called the victim thereafter and heard him arguing with someone; he told Tawanka that he would call her back.  When he did so, she asked him if he was okay, and he replied that he was fine.  Tawanka told the victim that she was going home and that she would call him later.  That was the last conversation that Tawanka had with the victim.  Tawanka later received a call from Ms. Sparkman telling her that the victim had been shot.

Tawanka told the investigating detectives that the last time she spoke to the victim, he was with Defendant Taylor.  Tawanka met with Detective Gernon and identified a picture of Defendant Taylor; she also identified Defendant Taylor in court as the man she knew as "Little Daddy."  Although the victim carried two cell phones – one for business, the other for personal use – the only items she retrieved from the coroner's office were a cigarette lighter and some change.

At the time of the incident, Ms. Andrea Taylor was an Assistant Police Communications Supervisor with the NOPD.  Ms. Taylor was responsible for overseeing 911-call operations, and identified State's exhibits twelve and thirteen as the incident recalls and audio recordings, respectively, of the 911 calls received in this case.  One of the 911 calls gives the description of persons running from the scene; the next is someone yelling that someone had been shot; and, another reports an accident and that someone has been shot.  All of the calls referenced a white vehicle in the area of Josephine and Laurel Streets.

In accordance with La. R.S. 15:440.1 *et seq.*,[FN3] D.T.1[FN4] testified that he lived in the neighborhood when the shooting occurred and would walk around the corner to buy candy from a store.  On the date of the incident, D.T.1, his sister, D.T.2, and his cousin walked to the store.  While walking, they observed a passing white vehicle containing three people – one person was in the driver's seat, another man was seated next to him, and another man was in the back seat.  As D.T.1 was entering the store, he observed Defendant Taylor and Defendant Collins each shoot the driver, and he heard two gunshots come from the vehicle.  Thereafter, D.T.1 observed Defendants, who he knew from the neighborhood, exit from the back of the white vehicle and run.  D.T.1 also observed Defendant Collins, who was sitting in the front passenger seat, getting into the back of the vehicle with Defendant Taylor; Defendants then exited the back of the vehicle.

[FN3]   This witness' testimony was taken in the judge's chambers in the presence of both defense counsels, the prosecutors and the judge and simultaneously broadcast via closed circuit television for the jury and the defendants seated in the court room.

[FN4]  Two witnesses are juveniles, and rather than their full names, their initials are used throughout this opinion.  However, the initials of both witnesses are "D.T.", therefore, "D.T.1," is used in this opinion for the male juvenile, who was eight-years-old at the time of the incident, and "D.T.2" is used for his female sister, who was eleven-years-old at the time of the incident.

Defendants were armed with black guns when they exited the vehicle.  D.T.1 testified that the gun held by Defendant Collins was "big like an AK machinegun" and the other was "little," like the kind police officers carry.  As D.T.1 ran from the scene, he observed Defendant Collins jump over a black fence; D.T.1 ran home and told his mother what he observed.  D.T.1 spoke to Detectives Gernon and Williams and identified pictures of Defendants as the men he observed exiting the white vehicle.  D.T.1 identified pictures of Defendants Collins and Taylor and the shooting scene.

Detective Nicholas Gernon responded to a call received involving a homicide at Laurel and Josephine Streets and led the investigation of the shooting death of Jerome Sparkman.  When he arrived on the scene, Det. Gernon noted that the area was a residential neighborhood with a corner store and retirement community in close proximity.  A white Impala, with the deceased victim sitting in the driver's seat, had hit a blue truck.  The Impala's driver, front passenger, and left rear doors were open.  Det. Gernon directed police personnel in photographing and collecting evidence from the scene, interviewing the victim's family members and canvassing the neighborhood for potential witnesses.  The police investigation indicated that the shooters were inside the vehicle when the victim was shot.  While inspecting the white Impala, police recovered three cell phones from the vehicle.  The police determined that two of the phones belonged to the victim and the third, a black Boost phone that was found on the floor of the front passenger seat, belonged to Defendant Collins.

Det. Gernon spoke to Christopher Meis ("Mr. Meis"), who Det. Gernon learned was in the store when the shooting began. Mr. Meis ran outside of the store and saw two suspects fleeing from the white vehicle. Mr. Meis described the suspect who exited from the front passenger seat as approximately 5'7" tall with light skin complexion and the beginnings of a goatee and a fresh abrasion on his face. Mr. Meis also described the suspect in the rear driver's side seat as approximately 5'10" tall, lighter skinned than the other suspect, with the beginning of twists in his hair. However, Mr. Meis could not identify either suspect from a photo lineup compiled by Det. Gernon.

Det. Gernon then spoke to D.T.2, who stated that on her way to the store, she witnessed the shooting and the car accident that ensued. D.T.2 identified Defendant Collins from a photo lineup as the suspect who was seated in the front passenger seat at the time of the shooting. Det. Gernon also interviewed D.T.2's younger brother, D.T.1, who accompanied her as she was en route to the store and also identified Defendant Collins as one of the shooters.

Det. Gernon obtained an arrest warrant for Defendant Collins, and Defendant Collins' mother turned him in to the police. After advising Defendant Collins and his mother of their rights, they agreed to be interviewed by Det. Gernon. Initially, Defendant Collins told Det. Gernon that he and Defendant Taylor were together on the day of the shooting. They went to Defendant Taylor's Aunt Irene's ("Irene") house in the morning and then back and forth to Defendant Taylor's mother's house.

Later that afternoon, they went to Peewee's house, and the victim allowed Defendant Collins to use his vehicle for a trip to the store to buy cigarettes. That afternoon, he learned that the victim had been shot. During further questioning, Defendant Collins admitted that he was in the front passenger seat of the victim's vehicle when the shooting occurred; however, Defendant Collins stated that a person in the back seat shot the victim. Defendant Collins stated that he could not identify the shooter and that he ran from the shooting and stashed his bloody clothing at Irene's house.

The search of Irene's house yielded the recovery of a fully loaded assault rifle from a crawl space in the garage; three boxes of ammunition for the rifle; a box of .45-caliber ammunition; a 9-millimeter handgun, which was stashed underneath the mattress in the master bedroom; 9-millimeter ammunition; and, magazines for the weapons. Fingerprint testing on the weapons and ammunition

produced negative results.  The 9-millimeter gun was registered to Irene and testing excluded it as the murder weapon.

Continuing the investigation, Det. Gernon compiled a photo lineup and presented it to D.T.1 and D.T.2.  D.T.1 identified the picture of Defendant Taylor as the man he observed shooting the victim in the head, and D.T.2 recognized the picture of Defendant Taylor as the man she saw seated in the back of the white vehicle, who ran from the scene.

After Det. Gernon retrieved the bullet recovered from the victim's head during autopsy, he searched the victim's vehicle again and located a spent bullet casing under the driver's seat.  He also discovered a Sprite can, a T-shirt, hat and water bottle.  Testing of the objects revealed no fingerprints on the water bottle, and hair and fiber samples from the other objects were not able to be used.  However, the Sprite can contained two fingerprints that were matched to Defendant Collins' fingerprints.  Det. Gernon obtained a search warrant for Defendant Taylor's last known address, and that search produced Defendant Taylor's social security card, birth certificate, paperwork from traffic court, several boxes of shotgun shells and pictures of Defendant Taylor.  However, information gleaned from the autopsy indicated that the victim was not killed by a shotgun.

New Orleans Police Department (NOPD) fingerprint analysis expert, Officer Joseph Jackson, analyzed fingerprints taken in the investigation of this case.  No fingerprints were identified as belonging to Defendant Taylor, but one fingerprint tested positive as to Defendant Collins.

Sergeant Byron Winbush, NOPD expert in ballistics and firearms identification, determined that the bullet retrieved during the victim's autopsy was either a .38 caliber or a .357 Magnum caliber.  Because there was no weapon retrieved during the investigation, Sgt. Winbush made his determination by measuring the base diameter of the bullet.  However, when he compared the bullet to the bullet casing retrieved from the scene, he determined that the bullet jacket and the bullet were fired from the same weapon.  Sgt. Winbush concluded that the bullet could not have been fired from a .38 caliber or 9-millimeter weapon.

D.T.2, D.T.1's older sister, lived with her family at the time of this shooting.  When walking to the store on the date of the incident, as she turned the corner near the store, she saw Defendant Collins shoot a man seated in the driver's seat of a white vehicle.  In addition to the victim and Defendant Collins, D.T.2 saw Defendant Taylor seated in the back seat of the white vehicle, behind the victim.

After the victim was shot, Defendants Collins and Taylor jumped from the vehicle and ran.   D.T.2 observed a gun in Defendant Taylor's hand and a gun in Defendant Collins' hand.   After the shooting, D.T.2, D.T.1 and Melvin ran toward home.  Melvin warned D.T.1 and D.T.2 not to look back, but D.T.2 did.  When D.T.2 arrived home, she told her mother what she had seen.  Later that day, D.T.2 relayed what she had seen to Det. Gernon.  The detective showed her a photo lineup from which she identified Defendant Collins as one of the shooters.   A few days later, from another photo lineup, she identified Defendant Taylor as the other shooter.   When D.T.2 initially spoke to the Det. Gernon, she told him that Defendant Taylor shot the victim because she was afraid of Defendant Collins.  Later, however, she stated that both Defendants Collins and Taylor shot the victim.

Dr. Samantha Huber, forensic pathologist for the Orleans Parish Coroner's Office, performed the autopsy on the victim's body.  The victim suffered three gunshot wounds to the head and a bruise on the nose.  One of the gunshot wounds was a close-contact wound to the right, back of his head.  The area around the wound bore a muzzle imprint from the murder weapon, soot, and searing.  That wound caused extensive brain damage.  Two bullet fragments were retrieved from this wound.  The second wound was to the left, back of the victim's head.  The shot traveled forward and exited the victim's right cheek, causing extensive brain damage.   The third wound was a shallow, penetrating injury to the victim's hand.  That wound was not through-and-through, and appeared as if the bullet ricocheted or had passed through something prior to entering the victim's hand.  Either of the head wounds would have been fatal and probably killed the victim almost instantly.

During his testimony, Mr. Meis also explained that in 2008, he was a member of the Guardian Angels, a volunteer crime fighting organization.  Mr. Meis exited the store when he heard a shot and a crash, and he noticed a white vehicle pushing a blue truck through the intersection.  Mr. Meis saw children running and two men exit the vehicle and run down Laurel Street toward Jackson Avenue.  He did not notice whether either man was armed when exiting the vehicle. Mr. Meis observed the victim in the vehicle, and, after determining that he needed medical assistance, Mr. Meis called 911.[7]

_____

[7] State v. Collins, 65 So.3d 271, 275-79 (La. App. 4th Cir. 2011); State Rec., Vol. III of X.

### III.  Petitioner's Claims

### A. Confrontation Clause Violations

Petitioner asserts two claims based on the Confrontation Clause.  In his first claim, he argues that his rights were violated when D.T.1 was allowed to testify by closed-circuit video without a sufficient foundation demonstrating potential harm to the witness.  On direct appeal, the Louisiana Fourth Circuit Court of Appeal denied that claim, holding:

> Defendants argue that the trial court improperly allowed D.T.1 to testify by closed-circuit television rather than in the court room. La. R.S. 15:283 provides, in pertinent part:
>
> > A. On its own motion or on the motion of the attorney for any party, a court may order that the testimony of a protected person[FN5] who may have been a witness to or victim of a crime be taken in a room other than the courtroom and be simultaneously televised by closed circuit television to the court and jury, when the court makes a specific finding of necessity based upon both of the following:
> >
> > > [FN5]  A "protected person" includes a person under the age of seventeen years who is a witness in a criminal prosecution. See La. R.S. 15:283(E)(1).
> >
> > (1) Expert testimony that the child would be likely to suffer serious emotional distress if forced to give testimony in open court.
> >
> > (2) Expert testimony that, without such simultaneous televised testimony, the child cannot reasonably communicate his testimony to the court or jury.
>
> The Confrontation Clause of the Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted

with the witnesses against him."  This right provides "two types of protections for a criminal defendant:  the right physically to face those who testify against him, and the right to conduct cross-examination."  Coy v. Iowa, 487 U.S. 1012, 1017, 108 S.Ct. 2798, 2801, 101 L.Ed.2d 857 (1988).  However, public policy considerations and necessities may take precedence over "face-to-face" confrontation.  Maryland v. Craig, 497 U.S. 836, 849, 110 S.Ct. 3157, 3165, 111 L.Ed.2d 666 (1990).

In Maryland v. Craig, *supra*, the United States Supreme Court reviewed a Maryland statute that allowed a child abuse victim to testify by one-way closed circuit television where it was shown that the child witness would suffer serious emotional distress such that the child could not reasonably communicate.  Craig, 497 U.S. at 840-42. The Court held that if the state makes an adequate showing of necessity, the state's interest in protecting child witnesses from the trauma of testifying in a child abuse case is sufficiently important to justify the use of a special procedure that permits a child witness in such cases to testify at trial against a defendant in the absence of face-to-face confrontation with the defendant.  Id., 497 U.S. at 855. According to the Court, although the Maryland statute, when invoked, prevented a child witness from seeing the defendant as he or she testified against the defendant at trial, the procedure preserved all of the other elements of the confrontation right:  "The child witness must be competent to testify and must testify under oath; the defendant retains full opportunity for contemporaneous cross-examination; and the judge, jury, and defendant are able to view (albeit by video monitor) the demeanor (and body) of the witness as he or she testifies."  Id., 497 U.S. at 851.  The Craig court noted that although it was aware of the many subtle effects face-to-face confrontation may have on an adversary criminal proceeding, the presence of these other elements of confrontation – oath, cross-examination, and observation of the witness' demeanor – adequately ensures that the testimony is both reliable and subject to rigorous adversarial testing in a manner functionally equivalent to that accorded live, in-person testimony.  Id.

Further, in Craig, the Court stated that the requisite finding of necessity must be a case-specific one.  Id., 497 U.S. at 855.  The trial court must hear evidence and determine whether use of the one-way closed-circuit television procedure is necessary to protect the welfare of the particular child witness who seeks to testify.  Id.  The trial court must also find that the child witness would be traumatized, not by the courtroom generally, but by the presence of the defendant.  Id.,

497 U.S. at 856.  Denial of face-to-face confrontation is not needed to further the state's interest in protecting the child witness from trauma unless it is the presence of the defendant that causes the trauma.  Id.  Finally, the trial court must find that the emotional distress suffered by the child witness in the presence of the defendant is more than *de minimis*, *i.e.*, more than mere nervousness, excitement or some reluctance to testify.  Id.  The Court concluded that, where necessary to protect a child witness from trauma that would be caused by testifying in the physical presence of the defendant, at least where such trauma would impair the child's ability to communicate, the Confrontation Clause does not prohibit use of a procedure that, despite the absence of face-to-face confrontation, ensures the reliability of the evidence by subjecting it to rigorous adversarial testing and thereby preserves the essence of effective communication.  Id., 497 U.S. at 857.

In the matter *sub judice*, on the morning of trial, the State filed a motion to allow the closed-circuit presentation of the testimony of D.T.1 under La. R.S. 15:283, arguing that D.T.1 would likely suffer serious emotional distress and be unable to effectively communicate his testimony.  In support of the motion, the State offered sworn letters from Drs. Richard Richoux and Rafael Salcedo, who interviewed D.T.1 and opined that requiring D.T.1 to testify live in the courtroom "would be extremely traumatic and stressful for him [and] would ... likely ... exacerbate what appeared to be pre-existing symptoms of a post-traumatic stress disorder."

Dr. Sarah Deland, accepted as an expert in the fields of general and forensic psychiatry, testified for the State that if D.T.1 were required to testify in open court, he would likely suffer extreme emotional distress and be unable to reasonably communicate his testimony to the jury.  Contesting Dr. Deland's testimony, the defendants argue that the factors Dr. Deland gave in support of her opinion were generalities, none of which was sufficient to support the trial court's finding that D.T.1 would be able to testify if not in the defendants' presence.  Dr. Deland's testimony regarding D.T.1's ability to testify in the presence of Defendants supported the trial judge's finding.  Dr. Deland testified in part as follows:

[DIRECT EXAMINATION OF DR. DELAND]

A.  My findings were that overall I found [D.T.1] to be a ... fairly intelligent child.  He did not present any

- 14 -

overt symptom of ongoing mental illness.  However, he was ... anxious about his situation.

He was able to tell me his version of the events that he witnessed very clearly without any difficulty.  However, when it came to talking about coming into court, he became very, very anxious.  He pretty much completely shut down, started drawing, did not want to talk about it, talked about other things, got up and down out of his chair, asked to leave the room.

And so based upon my ... observations [of his behavior], it was my opinion that it would cause him extreme emotional distress to come into open court.

Q.  And, in your opinion to believe if he were to testify in open court, would he be able to communicate with the court ... express what he experienced?

A.  I think that's – I mean – in open court, I have my doubts about whether or not he would be able to do that.

* * *

[CROSS EXAMINATION]

Q.  Doctor, let me ask you something if you don't mind. Anyone that's called as a witness, who's appearing for the first time, whether they're 10 or 44, there's a degree of anxiousness, nervousness?

A.  Yes, I'd agree with that.

* * *

Q.  And there's no obvious – you said [D.T.1] is intelligent?

A.  Yes.

- 15 -

Q.  And he recalled everything to you without any problem?

A.  That's correct.

Q.  And you said that when you mentioned about going to court he showed some reluctance, as most witnesses do, is that correct?

A.  Well, I wouldn't really say so much reluctance as extreme anxiety.

Q.  Now, how would you categorize extreme anxiety?

A.  Like I said, he pretty much – he had been talking to me fairly regularly before, when once that happened, he really just shut down, meaning he broke eye contact, he looked down and just started drawing. He started asking me about extraneous things like Sponge Bob or how do you spell Sponge Bob, things like that, getting up and down out of his chair, and then when I asked to talk to his Mom, he was very eager to leave.  He asked, "So I can leave?"

* * *

Q.  And my problem is trying to understand that this natural fear – as a new attorney is fearing going to trial for the first time, or a witness being called no matter what the age, is very reluctant, and fearful, and has anxiety – that this is basically what he's feeling right now because he's never been in the courtroom.  Would you agree with that?

A.  Yes.

Q.  ... it would cause him extreme emotional distress?

A.  Yes, it would.

- 16 -

> Q. Okay. And, in your opinion, would part of that be because he was placed in the same room with the defendants?
>
> A. I'm sure that has – yes. That has something to do with it. He is scared.
>
> Q. And you mentioned, when you started speaking about actually coming into the courtroom and testifying, he exhibited behavior such as shutting down, losing eye contact, going off topic. Would you expect that that would be his behavior if he were brought into court?
>
> A. Yes. That's one of the things that I based my – based my opinion upon.
>
> Q. And that would cause him to not reasonably be able to communicate what he experienced?
>
> A. Yes.
>
> We find that Dr. Deland's expert testimony conforms to the Maryland v. Craig, 497 U.S. 836, 849, 110 S.Ct. 3157, 3165, 111 L.Ed.2d 666 (1990) standard that the emotional distress suffered by the child witness in this case in the presence of the defendant is more than *de minimis*, *i.e.*, more than mere nervousness or excitement or some reluctance to testify. The trial court did not err in allowing D.T.1 to testify outside the presence of the defendants.[8]

The Louisiana Supreme Court then denied petitioner's related writ application without assigning additional reasons.[9]

---

[8] State v. Collins, 65 So.3d 271, 279-82 (La. App. 4th Cir. 2011); State Rec., Vol. III of X.

[9] State v. Collins, 78 So.3d 140 (La. 2012); State Rec., Vol. II of X.

Under the stringent standards of review mandated by the AEDPA, petitioner may be granted relief with respect to this claim only if he shows that the foregoing state court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Here, he has not made that showing for the following reasons.

Obviously, the state court correctly identified the controlling clearly established federal law, i.e. the Craig decision. In Craig, the United States Supreme Court expressly held that "where necessary to protect a child witness from trauma that would be caused by testifying in the physical presence of the defendant, at least where such trauma would impair the child's ability to communicate, the Confrontation Clause does not prohibit use of a procedure that, despite the absence of face-to-face confrontation, ensures the reliability of the evidence by subjecting it to rigorous adversarial testing and thereby preserves the essence of effective confrontation." Craig, 497 U.S. at 857.

Moreover, there is simply no basis for this Court to conclude that the state courts unreasonably applied Craig to the facts of this case. Here, as in Craig, the child witness testified under oath, was subject to full cross-examination, and was able to be observed by the judge, jury, and defendants as he testified, thereby adequately ensuring the reliability of evidence. See Craig, 497 U.S. at 857. While petitioner speculates that the procedure was not actually "necessary" to protect the child witness from trauma which would have impaired his ability to communicate, the state courts, after careful consideration of the evidence presented, expressly found that the procedure was necessary. Petitioner has never presented any evidence whatsoever to the contrary.

Accordingly, because petitioner has failed to show that the state court decision was contrary to, or involved an unreasonable application of, clearly established federal law, the AEDPA requires this federal *habeas* Court to defer to the state court decision and reject this claim.[10]

In his second claim, petitioner argues that his rights under the Confrontation Clause were violated by the admission of the 911 calls into evidence. On direct appeal, the Louisiana Fourth Circuit Court of Appeal likewise denied that claim, holding:

> Defendants Collins and Taylor argue that the trial court erred in allowing the 911 tapes into evidence. Defendants contend that because the callers did not testify, and were thus not subjected to confrontation, Defendants' Sixth Amendment rights were violated.
>
> In support of Defendants' contention that their right to confront their accusers was violated, Defendants cite Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), in which the U.S. Supreme Court found that certain ex parte examinations, while admissible under hearsay rules, are the type of testimonial evidence against the accused that the Confrontation Clause is supposed to prevent. The Supreme Court held that the Sixth Amendment bars admission of testimonial statements by a witness who did not appear at trial unless he was unavailable to

---

[10] The undersigned notes that when petitioner's co-defendant, Justin Collins, raised this same claim in his federal *habeas corpus* proceeding, the claim was likewise rejected in that case. Collins v. Cain, No. 13-0251, 2013 WL 4891923, at *8-19 (E.D. La. Sept. 11, 2013). In that case, in an opinion adopted by the United States District Judge Kurt D. Englehardt, United States Magistrate Judge Joseph C. Wilkinson, Jr., concluded:

> D.T.1's closed-circuit televison testimony was permissible under Craig and its progeny and was *not* a violation of the Confrontation Clause. Even if it could be characterized somehow as a Confrontation Clause violation, however, the cumulative nature of D.T.1's testimony, the availability and actuality of vigorous and contemporaneous cross-examination of D.T.1 via closed-circuit television at trial and the strength of the State's case against Collins establish that any undermining of Collins's right to confront D.T.1 in person was harmless error.

Id. at *19. Those observations apply with equal force with respect to petitioner.

testify, and the defendant had a prior opportunity to cross examine the witness.  Id.  In Davis v. Washington, 547 U.S. 813, 822, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006), specifically in the context of 911 calls, the Supreme Court declared that "[s]tatements are nontestimonial when made in the course of police investigation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency."  Conversely, statements are "testimonial when the circumstances objectively indicate that is no such ongoing emergency, and that the purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecutions." Id., 547 U.S. at 822.

In the matter before us, the 911 calls ranged from descriptions of suspicious persons running with guns to people reporting the shooting.  Defendants specifically object to the call from a caller identified only as "Tashia," who identified Defendants Collins and Taylor by name and provided the path they were running.

Applying Davis to the facts before us, we find that the 911 calls were non-testimonial and, therefore, the admission of the recording did not implicate the Confrontation Clause.  The primary purpose of the callers' statements and of the questioning by the 911 operator was to address and resolve an ongoing emergency.  At the time the 911 calls were initiated, gunshots had been fired, and the callers feared for their safety and the safety of others.  The questions posed by the operator were necessary to evaluate the situation, locate the perpetrators and to dispatch the required assistance.[11]

The Louisiana Supreme Court then denied petitioner's related writ application without assigning additional reasons.[12]

Once again, the state court correctly identified the controlling clearly established federal law, i.e. the Crawford and Davis decisions.  In Davis, the Supreme Court explained:

The Confrontation Clause of the Sixth Amendment provides: "In all criminal prosecutions, the accused shall enjoy the right ... to

---

[11]  State v. Collins, 65 So.3d 271, 282-83 (La. App. 4th Cir. 2011); State Rec., Vol. III of X.

[12]  State v. Collins, 78 So.3d 140 (La. 2012); State Rec., Vol. II of X.

> be confronted with the witnesses against him." In <u>Crawford v. Washington</u>, 541 U.S. 36, 53-54, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), we held that this provision bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." A critical portion of this holding ... is the phrase "testimonial statements." Only statements of this sort cause the declarant to be a "witness" within the meaning of the Confrontation Clause. See <u>id.</u>, at 51, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177. It is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause.

<u>Davis</u>, 547 U.S. at 821. The Supreme Court continued:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

<u>Id</u>. at 822.

Interestingly, <u>Davis</u>, like the instant case, also involved a Confrontation Clause claim based on the admission of a recording of a 911 call. In considering the claim, the Supreme Court noted: "If 911 operators are not themselves law enforcement officers, they may at least be agents of law enforcement when they conduct interrogations of 911 callers. For purposes of this opinion (and without deciding the point), we consider their acts to be acts of the police." <u>Id</u>. at 823. The Supreme Court then went on to hold that statements made in a 911 call seeking immediate police assistance generally are not "testimonial" in nature and, therefore, pose no Confrontation Clause problems. The Supreme Court explained:

> [The 911 caller] simply was not acting as a *witness*; she was not
> *testifying*.  What she said was not "a weaker substitute for live
> testimony" at trial, United States v. Inadi, 475 U.S. 387, 394, 106
> S.Ct. 1121, 89 L.Ed.2d 390 (1986), like Lord Cobham's statements
> in Raleigh's Case, 2 How. St. Tr. 1 (1603), or Jane Dingler's *ex parte*
> statements against her husband in King v. Dingler, 2 Leach 561, 168
> Eng. Rep. 383 (1791), or Sylvia Crawford's statement in Crawford.
> In each of those cases, the *ex parte* actors and the evidentiary
> products of the ex parte communication aligned perfectly with their
> courtroom analogues.  [The 911 caller's] emergency statement does
> not.  No "witness" goes into court to proclaim an emergency and seek
> help.

Davis, 547 U.S. at 828.

For the reasons explained by the state court, petitioner has once again failed to show

that the state court decision was contrary to, or involved an unreasonable application of, clearly

established federal law.  Therefore, the AEDPA likewise requires this federal *habeas* Court to defer

to the state court decision and reject this claim.[13]

---

[13]   Again, the undersigned notes that petitioner's co-defendant also raised this same claim in his
federal *habeas corpus* proceeding, and the claim was likewise rejected in that case.  Collins v. Cain,
No. 13-0251, 2013 WL 4891923, at *20-21 (E.D. La. Sept. 11, 2013).  In that case, in the opinion
adopted by the Judge Englehardt, Magistrate Judge Wilkinson concluded:

> In this case, I find that most of the 911 calls reporting the incident and
> requesting police and/or medical assistance, including especially the 911 call from
> "Tashia" identifying the perpetrators as Justin and Marion, were non-testimonial.
> These 911 calls were clearly related to an ongoing emergency.  See Martin v.
> Warden Forcht Wade Corr. Ctr., 289 F. App'x 682, 683 (5th Cir. 2008) (quoting
> Davis, 547 U.S. at 822) (statements to the 911 operator by a non-testifying attempted
> manslaughter victim, including her identification of defendant, "were non-testimonial
> because the circumstances, viewed objectively, indicated that the primary purpose
> of the interrogation by the 911 operator was 'to enable police assistance to meet an
> ongoing emergency.'").
> In contrast, the 911 call placed for the purpose of speaking with the
> investigating detective to provide him or her with a "tip" was testimonial.  This 911
> call was placed in an attempt to aid a later criminal prosecution and occurred after

B.  Evidentiary Error

Petitioner's third claim is that the state district court erred in admitting the firearms and ammunition into evidence.  On direct appeal, the Louisiana Fourth Circuit Court of Appeal also denied that claim, holding:

> Defendants argue that the trial court erred in admitting firearms and ammunition that were unrelated to the offenses charged in the indictment into evidence.  Pursuant to search warrants issued in this case, the police confiscated guns and weapons from Defendant Taylor's home on Annunciation Street and from his Aunt Irene's house, where Defendants were seen running to with guns after the shooting.  However, ballistics testing indicated that the guns and ammunition seized were not used to commit the murder.  Defendants argue, therefore, the weaponry had no probative value and was introduced simply to prejudice Defendants by painting them as dangerous, armed persons.
>
> Defendants cite several cases in support of their argument that it is error to admit a weapon into evidence when the weapon was not

the emergency had passed, when police had already arrived and were investigating the murder.  Admission of this testimonial evidence, however, constituted harmless error.  The identity of the assailants had already been provided by the non-testimonial call from Tashia.  The only additional information provided by the woman seeking to give a "tip" to police was a location where the perpetrators had headed immediately after the incident.  The caller admitted, however, that she did not know the perpetrators' current location.  Adding to the relative insignificance of this sole testimonial call is the fact that the identity of the perpetrators was clearly established at trial via the live testimony of eyewitness D.T.2.  As noted above, D.T.2, who knew both Justin Collins and Marion, clearly identified them as the persons who fled the car after shooting the driver.

The state court's admission of the 911 calls did not result in a constitutional violation of the Confrontation Clause rendering Collins's trial fundamentally unfair.  The state courts' rejection of the instant claim does not represent an unreasonable application of Supreme Court law to the facts of this case.

Id. at *21.  Similarly, the undersigned finds that even if any of the 911 calls (or any portions therefore) were found to be testimonial in nature, petitioner still would not be entitled to relief because any Confrontation Clause violation was ultimately harmless.

the weapon used in the commission of the offense.  However, we do not find support for Defendants' argument therein.

In State v. Manieri, 378 So.2d 931 (La. 1979), the trial court admitted into evidence three knives which were "similar" to the murder weapon but which were not used in the slaying.  The Supreme Court held that the trial court erred in admitting the knives into evidence.  Id., 378 So.2d at 933.  However, such error was harmless because no effort was made to connect the knives to the crime or to the defendant, and a State witness testified that the knives were not the murder weapon.  Id.

In State v. Landry, 388 So.2d 699 (La. 1980), the trial court admitted into evidence a pocketknife found on the defendant when he was arrested for a stabbing death.  The Supreme Court found that the trial court erred in admitting the knife into evidence.  Id., 388 So.2d at 704.  However, because the State made no attempt to connect the knife with the killing or exploit the admission of the knife in argument, the Court held that the error was not reversible.  Id.

In State v. Villavicencio, 528 So.2d 215 (La.App. 4 Cir. 1988), the trial court admitted a .22 caliber rifle and bullets, .357 caliber bullets, and photographs of the defendant's car showing these items in the interior of the vehicle.  The defendant was charged with shooting the victim with a handgun.  Id., 528 So.2d at 216.  This Court found that the trial court erred in admitting the evidence because it was prejudicial, citing Manieri, but did not specifically find that the prejudicial effect outweighed any probative value of the evidence.  Id., 528 So.2d at 217.  This Court went on to find no reversible error because the State had not attempted to link the rifle and the .22 caliber bullets with the shooting.  Id.  No statement regarding any argument by the State concerning such evidence was made.

In State v. Richardson, 96-2598 (La.App. 4 Cir. 12/17/97), 703 So.2d 1371, the trial court allowed the introduction of a shotgun found abandoned by defendant in an incident unrelated to the armed robbery, committed with a handgun, for which he was being tried. This Court found no reversible error, in part, because the victim and a police officer testified that the shotgun had not been used in the robbery.  Id., 96-2598 at p. 6, 703 So.2d at 1374.

In this case, the investigating officer and the State's ballistics expert both testified that none of the guns introduced into evidence was the murder weapon, and no effort was made by the State to connect the guns to the murder or exploit the admission of the guns in argument.  While the weapons were not used in the murder, one of

- 24 -

the guns matched the description provided by an eyewitness of the gun that was observed in the possession of one of the defendants at the scene. Additionally, admission of the weapons was relevant to claims made by defendants during trial of an incomplete police investigation. Thus, we find no merit in Defendant's assignment of error, and we conclude that any error in their admission would be harmless.[14]

The Louisiana Supreme Court then denied petitioner's related writ application without assigning additional reasons.[15]

The United States Fifth Circuit Court of Appeals has held: "In habeas actions, [a federal court] does not sit to review the mere admissibility of evidence under state law." Little v. Johnson, 162 F.3d 855, 862 (5th Cir. 1998). Therefore, to the extent that petitioner is simply arguing that the state courts misapplied state evidence law, his claim is not reviewable in this federal proceeding.

To the extent that petitioner is also asserting a federal claim, he fares no better. Even if petitioner could show that the evidence was in fact improperly admitted, federal *habeas* relief still would not be warranted. The United States Fifth Circuit Court of Appeals has explained:

We will not grant habeas relief for errors in a trial court's evidentiary rulings unless those errors result in a "denial of fundamental fairness" under the Due Process Clause. The erroneous admission of prejudicial evidence will justify habeas relief only if the admission was a crucial, highly significant factor in the defendant's conviction.

---

[14] State v. Collins, 65 So.3d 271, 283-84 (La. App. 4th Cir. 2011); State Rec., Vol. III of X.

[15] State v. Collins, 78 So.3d 140 (La. 2012); State Rec., Vol. II of X.

Neal v. Cain, 141 F.3d 207, 214 (5th Cir. 1998) (citations omitted); see also Little, 162 F.3d at 862 ("[O]nly when the wrongfully admitted evidence has played a crucial, critical, and highly significant role in the trial will habeas relief be warranted.").

Here, it simply cannot be said that the evidence played a crucial, critical, and highly significant role in petitioner's conviction. Rather, even aside from the foregoing evidence, there was additional overwhelming evidence of petitioner's guilt of the instant offense, including the compelling eyewitness testimony. Therefore, to the extent that petitioner is also asserting a federal claim, he is not entitled to relief.[16]

### C.  Cumulative Error

Lastly, petitioner argues that he is entitled to relief when the three foregoing errors are considered cumulatively. However, the United States Fifth Circuit Court of Appeals has long expressed its disfavor of such claims in federal *habeas corpus* proceedings. For example, the Fifth Circuit has noted:

> [Petitioner] finally asserts that even if none of his claims entitles him to relief individually, all of them collectively, do. Habeas relief is available only where a prisoner is in custody in violation of the Constitution or of federal law. 28 U.S.C. § 2254. [Petitioner] cites no authority in support of his assertion, which, if adopted, would encourage habeas petitioners to multiply claims endlessly in the hope that, by advancing a sufficient number of claims, they could obtain relief even if none of these had any merit. We receive enough meritless habeas claims as it is; we decline to adopt a rule that would have the effect of soliciting more and has nothing else to recommend it. Twenty times zero equals zero.

---

[16]   When petitioner's co-defendant raised this claim in his federal *habeas corpus* proceeding, the claim was similarly rejected. Collins v. Cain, No. 13-0251, 2013 WL 4891923, at *22-23 (E.D. La. Sept. 11, 2013).

<u>Mullen v. Blackburn</u>, 808 F.2d 1143, 1147 (5th Cir. 1987).

Nevertheless, the Fifth Circuit subsequently recognized such claims, albeit in a strictly narrow set of circumstances.  The Fifth Circuit noted:

> In <u>Derden v. McNeel</u>, 978 F.2d 1453, 1454 (5th Cir. 1992), <u>cert. denied</u>, 508 U.S. 960, 113 S.Ct. 2928, 124 L.Ed.2d 679 (1993), the en banc court recognized an independent claim based on cumulative error only where "(1) the individual errors involved matters of constitutional dimensions rather than mere violations of state law; (2) the errors were not procedurally defaulted for habeas purposes; and (3) the errors 'so infected the entire trial that the resulting conviction violates due process.'" <u>Id</u>., quoting <u>Cupp v. Naughten</u>, 414 U.S. 141, 147, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973).  *Meritless claims or claims that are not prejudicial cannot be cumulated, regardless of the total number raised.*  <u>Derden</u>, 978 F.2d at 1461.

<u>Westley v. Johnson</u>, 83 F.3d 714, 726 (5th Cir. 1996) (emphasis added); <u>see also</u> <u>Jackson v. Johnson</u>, 194 F.3d 641, 655 (5th Cir. 1999) ("The cumulative error doctrine provides relief only when the constitutional errors committed in the state court trial so fatally infected the trial that they violated the trial's fundamental fairness.").

In the instant case, petitioner has not shown that any of his individual claims have merit and, therefore, he is not entitled to relief merely by cumulating those claims, especially when he has not established that the cumulative effect of the alleged errors rendered his trial fundamentally unfair.[17]

---

[17]  This same claim was similarly rejected in petitioner's co-defendant's federal *habeas corpus* proceeding.  <u>Collins v. Cain</u>, No. 13-0251, 2013 WL 4891923, at *23 (E.D. La. Sept. 11, 2013).

## RECOMMENDATION

Accordingly, **IT IS RECOMMENDED** that the petition for federal *habeas corpus* relief filed by Marion Taylor be **DISMISSED WITH PREJUDICE**.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation in a magistrate judge's report and recommendation within fourteen (14) days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. 28 U.S.C. § 636(b)(1); Douglass v. United Services Auto. Ass'n, 79 F.3d 1415, 1430 (5th Cir. 1996) (en banc).[18]

New Orleans, Louisiana, this twelfth day of May, 2015.


**DANIEL E. KNOWLES, III**
**UNITED STATES MAGISTRATE JUDGE**

---

[18] Douglass referenced the previously applicable ten-day period for the filing of objections. Effective December 1, 2009, 28 U.S.C. § 636(b)(1) was amended to extend that period to fourteen days.